# THE GIBSON LAW FIRM, PLLC

SUJATA S. GIBSON, ESQ.
120 E Buffalo Street, Suite 2
Ithaca, New York 14850

July 15, 2026

**VIA ECF**
Hon. Joan M. Azrack
United States District Judge
Eastern District of New York
100 Federal Plaza
Central Islip, New York 11722

      Re:    *Children's Health Defense, et al v. McDonald.* Dkt. 2:25-cv-06877

Dear Judge Azrack:

Pursuant to this Court's orders dated July 1 and 7, Plaintiffs respectfully submit this letter addressing the impact of the Second Circuit's recent decision on remand in *Miller v. McDonald* ("*Miller II*").

Defendant's assertion that *Miller II* is "entirely dispositive" overreads the decision. *Miller II* rejected the claims presented there: a Free Exercise challenge based on neutrality, general applicability, and the parental free-exercise rule recognized in *Wisconsin v. Yoder* and clarified in *Mahmoud v. Taylor*. This case presents a materially different factual record concerning how New York's medical-exemption system operates, additional secular exceptions not considered in *Miller II*, and independent Fourteenth Amendment claims not assessed in *Miller II* because they were not pressed on remand. *See* Pl. Mem. of Law, ECF Doc 11-1 at 14 of 31. Plaintiffs respectfully request full briefing before any dispositive ruling beyond the pending preliminary-injunction motion.

## I.    *Miller II* Does Not Foreclose Plaintiffs' *Fulton* Claims

Under Fulton, a law is not generally applicable in two circumstances: (1) when the law treats comparable secular conduct more favorably than religious activity, or (2) when "it 'invites' the government to consider the particular reasons for a person's conduct by providing 'a mechanism for individualized exemptions,'" *Fulton v. City of Philadelphia*, 593 U.S. 522, 533 (2021). Plaintiffs invoke both principles on facts not before the *Miller II* panel.

### A.  The record here shows individualized discretion in operation

*Miller II* rejected an inference of discretion drawn from aggregate variation—up to 50% of students receiving exemptions at one school and none at another—because, "[w]ithout information about a student population and its medical needs, there is no way to infer a discretionary element from the school officials' acceptance of medical exemption requests." ECF Doc 29-1 at 22-23. The panel also reasoned that the statute and regulations cabin officials' authority and *on the record before it*, the court found "officials do not have discretion to approve or deny exemptions 'for any reason.'" ECF Doc 29-1 at 22. Thus, the exception was deemed mandatory not individualized.

This record supplies the concrete information missing in *Miller* and raises a different as-applied question. Plaintiffs credibly allege that principals and administrators not only have authority but do in fact substantively assess whether physician certifications are sufficiently persuasive under discretion-laden "standards of care," while retaining final authority even when DOH recommends a different result. *See* Pl. Mem. of Law, ECF Doc 11-1 at 18-19 of 31; ECF 1 ¶ 70. DOH guidance states that schools are "not required or expected to blindly accept every medical exemption request," and directs case-specific review of physician certifications. The record shows that DOH also routinely advises schools that even if they believe an exemption is not warranted, schools exercise final authority to decide otherwise. *See, e.g.*, Complaint ECF 1 ¶70. That implementation evidence permits a finding that officials evaluate which medical reasons warrant solicitude rather than mechanically apply an objective rule.

Betsy Roe's history illustrates the point. Her district granted a full-year medical exemption, revoked it without any change in her underlying condition, granted a temporary exemption after she contracted mononucleosis, and then denied a second motion to renew despite continued acute illness and new laboratory evidence confirming continued infection. Defendant's own opposition confirms that the exemption was granted, rescinded, and then another temporarily granted, and then denied upon application to renew. ECF 1 ¶¶ 198-206; Roe Decl. ECF 11-6. Those shifting outcomes support an inference of discretionary judgment and not a mandatory, objectively defined exemption.

The same pattern appears elsewhere in the record. Raphael Goe was permitted to stay in school for ten months last year while his application was reviewed, then it was denied, despite articulating a text book ACIP precaution, and later the identical exemption was accepted by the same officials a year after his removal from school and services. Compl. ¶¶ 72-75, 164-177. Sarah Doe received an exemption based on one physician's certification, but the District later rejected *identical* language from another physician in the same practice, even though six physicians declined to vaccinate her and certified that vaccination would be detrimental under the governing standards of care. Compl. ¶¶ 66-67, 128, 140, 144. These are child-specific grants, revocations, denials, and reversals—not unexplained aggregate percentages. *Miller II* did not decide whether this alleged implementation of § 2164 creates an individualized-exemption mechanism under *Fulton*. The Court's decision leaves the door open for a different result on different facts. This case provides those facts.

### B. Plaintiffs identify secular exceptions not considered in *Miller II*

This case also presents allegations that trigger strict scrutiny under the second *Fulton* prong, which evaluates under inclusivity as an independent trigger. Under this prong, *Miller II* held that the medical exemption was not comparable to the former religious exemption because it is vaccine-specific, medically necessary, and temporary. ECF Doc 29-1 at 18. Plaintiffs rely on different comparators. For example, the complaint points out that Section 2164 does not apply to students over eighteen, although Plaintiffs allege that adult students pose the same acquisition and transmission risks as younger students. Compl. ¶¶ 41–44. Thus, Betsy's unvaccinated eighteen-year-old sister may attend the same school without restriction while Betsy is excluded until she turns eighteen in February. Compl. ¶¶ 10, 185, 196–208. For students receiving special-education services, that categorical tolerance may continue through age twenty-two. Compl. ¶¶ 218–221.

Unlike the medical exemption analyzed in *Miller II*, this exception is not tied to a specific vaccine, medical contraindication, or temporary condition. On the contrary, it can last years. For example, Raphael Goe just turned eighteen and as a disabled student plans to attend school and services for the next four years unvaccinated, which he is allowed to do under the statute.[1]

Plaintiffs also allege disease-specific underinclusiveness. Sarah Doe is missing only the third Hepatitis B dose, yet New York permits students actively infected with Hepatitis B to attend because the disease is not transmitted in ordinary school settings and does not present a direct threat to classmates. Compl. ¶¶ 128, 135–138. If those allegations are credited, excluding a student missing one dose while admitting an actively infected student materially undermines the asserted interest in a way *Miller II* did not consider. These secular tolerances independently require analysis under *Fulton* and *Tandon*.

## II.      *Miller II* Does Not Foreclose Plaintiffs' Parental Rights or Equal Protection Claims

*Miller II* analyzed the parents' claim only under "the *Yoder* standard as clarified by *Mahmoud*," explaining that the Second Circuit does not treat *Smith's* reference to "hybrid rights" as an independent trigger for heightened scrutiny. ECF Doc. 29-1 at 24. Applying that standard, the court held that § 2164 does not impose a burden "of the same character" as those in *Yoder* and *Mahmoud* because it imposes a health-and-safety condition on school attendance rather than regulating the content of a child's education or displacing parental religious formation. ECF Doc. 29-1 at 25–27. Plaintiffs preserve their disagreement with that holding. But their standalone substantive-due-process claim arises under a separate Fourteenth Amendment framework and does not depend on either the hybrid-rights doctrine or satisfaction of the *Yoder/Mahmoud* exception.

That distinction is confirmed by the Supreme Court's recent decision in *Mirabelli v. Bonta*, 607 U.S. 492 (2026) (per curiam). *Mirabelli* separately analyzed the plaintiffs' Free Exercise and Fourteenth Amendment parental-rights claims, applying the distinct constitutional framework governing each. *Miller II* discussed *Mirabelli* only in determining whether the vaccination requirement imposed a burden "of the same character" as the religious-development burdens identified in *Yoder* and *Mahmoud*. ECF Doc. 29-1 at 26–27. It did not address *Mirabelli's* separate recognition and analysis of the parents' substantive-due-process claim, much less determine whether the materially different allegations presented here state such a claim under that independent framework.

Under that separate line of precedent, parental authority—particularly over a child's medical care—is a fundamental liberty interest and as such, infringements are strictly scrutinized without regard to a laws neutrality, general applicability or conformity with *Yoder*. As the Supreme Court explained in *Mirabelli*, "[u]nder long established precedent, parents – not the State – have primary authority with respect to 'the upbringing and education of children,'" including authority to make medical decisions for their children. *Mirabelli*, 607 U.S. at 497 (citing *Pierce v. Society of Sisters*, 268 U.S. 510, 534–535 (1925); *Meyer v. Nebraska*, 262 U.S. 390, 399–400 (1923); and *Parham v. J.R.*, 442 U.S. 584, 602–03 (1979)). The Court stressed that "No party to this dispute questions

---

[1] Goe's preliminary injunction application is thus withdrawn, though the facts are still relevant to the assessment of Roe's.

the continued validity of *Meyer, Pierce* or *Parham J*," including in the school context. *Id.* It then concluded that the State was unlikely to satisfy strict scrutiny, notwithstanding its invocation of children's health and welfare, because the "policies cut out the primary protector of children's best interests: their parents." *Id.* (citing *Troxel v. Granville*, 530 U.S. 57, 68–69 (2000)).

Plaintiffs allege precisely that kind of direct displacement and disruption of parental authority. Sarah Doe was subjected to such intense exclusionary pressure and stigma that she secretly attempted to obtain the Hepatitis B vaccine against her mother's wishes and the advice of multiple physicians—first by going alone to a pharmacy and then by visiting a walk-in clinic with an adult relative while planning to conceal her medical history. Compl. ¶¶ 130–132. That is not merely an incidental consequence of a generally applicable health-and-safety rule. It is a concrete instance in which the State's exclusion policy placed a minor child in direct conflict with her parent's religious instruction and medical judgment and pressured the child to substitute the State's demanded medical decision for that of her parent. Thankfully, even without knowing the child's full medical history, the on call physicians refused to vaccinate Sarah as she was at clear risk of severe harm or death.

Sarah's experience is not isolated. Plaintiffs allege that the State's policy causes children to internalize the message that their families' religious beliefs and medical determinations render them "dirty," "unwelcome," or dangerous to others. Compl. ¶¶ 101–107. Betsy Roe, after years of exclusion, finally returned to school and began recovering socially and emotionally, only to face renewed removal unless her family violated its religious beliefs and medical judgment. Compl. ¶¶ 190–208. The resulting fear, uncertainty, and emotional distress were compounded by Betsy's observation that her unvaccinated eighteen-year-old sister could attend the same school without restriction. Compl. ¶¶ 196–208. These allegations describe a burden operating through coercion of the child, interference with parental medical decision-making, and disruption of the parent-child religious relationship—not merely the denial of access to a public benefit.

*Miller II* did not adjudicate this claim. It considered only whether § 2164 imposed the type of burden on religious development necessary to satisfy the *Yoder/Mahmoud* standard. It did not address this factual record, apply the substantive-due-process framework separately employed in *Mirabelli*, or decide whether the alleged coercion and displacement of parental medical authority infringe Plaintiffs' fundamental parental rights. It therefore does not foreclose relief under this independent cause of action.

Nor did *Miller II* adjudicate Plaintiffs' Equal Protection claim. That theory is not merely that § 2164 is facially neutral. It rests on the alleged religious classification, the burdening of fundamental parental and religious rights, and unequal treatment reflected in discretionary medical-exemption review and categorical secular tolerances. *See* Pl. Mem. of Law, ECF Doc. 11-1 at 14 of 31. Those claims require analysis under the constitutional standards applicable to the allegations and record before this Court; they cannot be automatically disposed of by *Miller II*.

### III.    *Doe v. McDonald* Does Not Change the Analysis

Defendant's supplemental authority, *Doe v. McDonald*, No. 26-cv-4176 (S.D.N.Y. July 10, 2026), is nonbinding and arose on a materially different record. *Doe* treated *Miller II* as dispositive

of substantively identical Free Exercise and Mahmoud claims, and rejected Equal Protection after noting that the plaintiff "does not defend it in her Reply." ECF Doc 31-1 at 4. The order did not address the evidence presented here: exemptions granted, revoked, renewed, denied, and later accepted; treating-physician certifications overridden after individualized review; an unvaccinated adult sibling attending the same school as the excluded minor; or the disease-specific allegations concerning Hepatitis B. It therefore does not resolve the distinct Fulton and Fourteenth Amendment theories presented here.

For the foregoing reasons, Plaintiffs respectfully request that this Court grant the pending preliminary injunction application for Rebecca Roe, who needs it to return to school in August to prevent further irreparable harm.

Respectfully submitted,

/s/ *Sujata S. Gibson*

Sujata Gibson, Esq.

CC: All counsel via ECF